**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**Eastern Division**

| | |
|---|---|
| EVA HODGES, *on behalf of herself and all others similarly situated*,<br><br>    Plaintiff,<br><br><br>v.<br><br><br><br>NEWREZ, LLC d/b/a SHELLPOINT MORTGAGE SERVICING, and THE BANK OF NEW YORK MELLON,<br><br>    Defendants. | Civil Action No. 1:25-cv-10147 |

**CLASS ACTION COMPLAINT**

Plaintiff Eva Hodges ("Plaintiff" or "Ms. Hodges"), individually and on behalf of all others similarly situated, through her undersigned counsel, files this Class Action Complaint against Newrez, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") and Bank of New York Mellon ("BONY") and alleges as follows:

**BACKGROUND**

1.      This case concerns the pattern and practice of Shellpoint and its predecessor in interest, Specialized Loan Servicing, LLC ("SLS")[1], of inflating borrowers' balances on long-dormant second mortgages through unfair, deceptive, and unconscionable means, and of BNYM to attempt to collect on amounts that were not legally charged, including under threat of foreclosure.

---

[1] Throughout this complaint, unless otherwise noted, SLS and Shellpoint are used interchangeably to refer to the defendant Newrez, LLC, herein.

2.      During the 2008 foreclosure crisis, many consumers—including Ms. Hodges—filed for bankruptcy to escape financial ruin and obtain a fresh start financially. Bankruptcy eliminated their personal liability for paying their second mortgages. Many homeowners were unaware, however, that the liens on their homes remained, meaning that if they did not continue paying their mortgages, the lender could foreclose on their homes.

3.      Often, for a long period of time after the homeowner's bankruptcy, the creditors would cease collection and write off the debts entirely for second mortgages. This was because home values had crashed dramatically during the crisis, and foreclosure would not yield any return on a second mortgage after a first mortgage was paid off. Because of this, these debts were often sold for pennies on the dollar, with the purchasers understanding that there was little likelihood of ever collecting. Meanwhile, homeowners went on with their lives.

4.      Ms. Hodges's experience is typical. Ms. Hodges obtained a Home Equity Line of Credit ("HELOC") second mortgage on her home in 2005 from the now-notorious Countrywide Home Loans.

5.      Ms. Hodges's second mortgage is now serviced by Shellpoint, the successor to the original servicer, SLS, following an acquisition in late 2023 and merger in early 2024.[2]

6.      Shellpoint is the servicer for BNYM. BNYM is the holder and assignee of Ms. Hodges's HELOC.

7.      In or around 2008, Ms. Hodges filed bankruptcy. At the time, the balance on her second mortgage was approximately $100,000.

---

[2] Rithm Capital Corp. Form 10-K at 8 (May 2, 2024); *Rithm Capital to Acquire Specialized Loan Servicing LLC*, Businesswire (Oct. 2, 2023), https://www.businesswire.com/news/home/20231001340340/en/Rithm-Capital-to-Acquire-Specialized-Loan-Servicing-LLC.

8.    Ms. Hodges did not surrender her home in the bankruptcy and remained living in it.

9.    Ms. Hodges received a bankruptcy discharge of her second mortgage in December 2008, and she stopped receiving monthly mortgage statements for her second mortgage at that time.

10.    Ms. Hodges's second mortgage was transferred to SLS for servicing in October 2013.

11.    SLS never sent Ms. Hodges monthly mortgage statements, even though she was entitled to receive them under the Truth in Lending Act ("TILA") and the Massachusetts Consumer Credit Cost Disclosure Act. Instead, SLS had a uniform policy and procedure of not sending monthly statements to borrowers whose loans had been discharged in bankruptcy.

12.    Statements, of course, would have regularly apprised Ms. Hodges of the balance of her loan, including interest that was supposedly still accruing after discharge and charge-off of the loan in 2008. Statements were especially critical because Ms. Hodges was at risk of losing her home through foreclosure.

13.    As a result of SLS's practice, Ms. Hodges heard nothing about her second mortgage for more than a decade.

14.    In or around October 2023, Shellpoint's parent company acquired SLS. Shortly thereafter, Shellpoint and SLS were formally merged.

15.    In early 2024, Ms. Hodges started receiving telephone calls and letters from SLS threatening foreclosure if she did not sell her home or apply for mortgage assistance.

16.    On January 23, 2024, SLS sent Ms. Hodges an acceleration letter claiming that she owed $152,820.46 to bring her second mortgage current.

17.    This amount was incorrect because it included interest and fees that accrued during the time that SLS was required to send her monthly mortgage statements but failed to do so.

18.    Ms. Hodges wrote to SLS and disputed the amount that SLS (by then, Shellpoint) claimed that she owed.

19.    In response to her letter, Shellpoint claimed that the amounts it had assessed on the loan were correct, that (contrary to the plain language of Massachusetts law and TILA) it was not required to send her monthly statements, and that it could foreclose on her home.

20.    In the meantime, Shellpoint started sending Ms. Hodges monthly billing statements. These statements claimed that Ms. Hodges owed more than $200,000 on her second mortgage and that she needed to pay more than $163,000 to bring her account current and avoid foreclosure.

21.    To avoid the exact circumstance Ms. Hodges now faces, TILA, Regulation Z, and the Massachusetts Consumer Credit Cost Disclosure Act require creditors like BNYM and the servicers like SLS and Shellpoint who work on their behalf to send monthly statements to borrowers. *See* 15 U.S.C. § 1637(b) ("The creditor of any account under an open end consumer credit plan shall transmit to the obligor, for each billing cycle at the end of which there is an outstanding balance in that account or with respect to which a finance charge is imposed, a statement setting forth [certain disclosures, including charges assessed]."); 12 C.F.R. § 1026.5(b)(2) ("The creditor shall mail or deliver a periodic statement as required by § 1026.7 for each billing cycle at the end of which an account has a debit or credit balance of more than $1 or on which a finance charge has been imposed" and exempting open-end credit loans that have been charged off only if the creditor "will not charge any additional fees or interest on the account"); Mass. Gen. Laws ch. 140D, § 11(b) ("The creditor of any account under an open end consumer

credit plan shall transmit to the obligor, for each billing cycle at the end of which there is an outstanding balance in that account or with respect to which a finance charge is imposed, a statement setting forth each of the following items to the extent applicable . . . ."); Mass. Gen. Laws Ann. ch. 140D, § 19(a) ("If the creditor fails to mail or deliver such statement or statements within the specified period, he shall not be entitled to any finance charge with respect to the next succeeding billing cycle based upon the balance of the preceding billing cycle. If any such finance charge is assessed or collected, the customer shall receive a credit or refund for any such finance charge assessed or collected other than in accordance with the provisions of this section within the two billing cycles following such assessment or collection, the failure to provide such credit or refund within the period specified shall subject the creditor to the penalties provided in section thirty-two.").

22.     In fact, the Consumer Financial Protection Bureau ("CFPB") has stated that times of default are "precisely when a consumer most needs the periodic statement" to "document fees and charges to the consumer."[3] Simply put, "as long as such charges may be assessed, the consumer is entitled to receive a periodic statement."[4]

23.     The CFPB has also identified the same issue with servicers like Shellpoint and SLS assessing interest and fees on long-dormant mortgages for periods in which they failed to provide monthly statements to consumers:

> Leading up to the 2008 financial crisis, many lenders originated mortgages to consumers without considering their ability to repay the loans. . . . One common piggyback mortgage product, known as an 80/20 loan, involved a first lien loan for 80 percent of the value of the home and a second lien loan for the remaining 20 percent of the valuation. . . . . [In the event of default,] the second mortgage holder only receives proceeds from the foreclosure sale if there are any funds left after

---

[3] 12 C.F.R. Part 1026 (CFPB Official Interpretations), https://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-tila.pdf (last visited Oct. 2, 2024).
[4] *Id.*

paying off the first mortgage. As a result, many second mortgage holders of piggyback loans, recognizing that a foreclosure would not generate enough money to cover even the first mortgage, charged their defaulted loans off as uncollectible and ceased communicating with the borrowers. . . . Many borrowers, having not received any notices or periodic statements for years, concluded that their second mortgages had been modified along with the first mortgage, discharged in bankruptcy, or forgiven. In recent years, as home prices have increased and borrowers have paid down their first mortgages, after years of silence, some borrowers are hearing from companies that claim to own or have the right to collect on their long-dormant second mortgages. These companies often demand the outstanding balance on the second mortgage, plus fees and interest, and threaten to foreclose if the borrower does not or cannot pay.[5]

24.    SLS's and Shellpoint's unfair and deceptive practices also violate contract waiver principles, which prevent creditors and servicers from claiming amounts owed under a contract when they have failed to provide notice to the borrower of the accumulation of those amounts, especially, in this case, when they had over a decade to provide notice but failed to do so.

25.    In blatant disregard of its obligations under TILA and Massachusetts law, SLS failed to send monthly statements to Ms. Hodges and others who had their debt discharged during bankruptcy while retaining an interest in their property, yet it continued to assess interest and fees to their accounts, causing the balances to increase with no notice to consumers about the ballooning balance.

26.    This conduct has significantly damaged Ms. Hodges and numerous other consumers, who have lost significant equity in their homes because of the illegal fees and charges that Shellpoint claims that they owe.

27.    As a result, Ms. Hodges brings class claims against the Defendant for failing to send monthly statements and otherwise unlawfully collecting in violation of TILA, 15 U.S.C. §

---

[5] Consumer Financial Protection Bureau, Advisory Opinion re: 12 C.F.R. Part 1006 (2023), https://files.consumerfinance.gov/f/documents/cfpb_regulation-f-time-barreddebtadvisory-opinion_2023-04.pdf.

1637(b); the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D; the Massachusetts consumer protection law, Mass. Gen. Laws ch. 93A; and the Massachusetts regulations on debt collection, 209 MCR 18.18, 18.19, 18.23, 18.24. She also seeks a declaratory judgment that SLS and Shellpoint are not entitled to collect the illegal interest and fees.

## JURISDICTION AND VENUE

28.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

29.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that establish this Complaint occurred in this District and Division, where Ms. Hodges resides.

## PARTIES

30.    Plaintiff Eva Hodges is a natural person residing in Plymouth, Massachusetts.

31.    Defendant Newrez, LLC d/b/a Shellpoint is a limited liability company organized under the laws of Delaware. Shellpoint is the successor-in-interest to SLS by virtue of the acquisition of SLS by Shellpoint's parent company, Rithm Capital, and the merger of SLS with Shellpoint, effective May 1, 2024. Defendant Newrez, LLC d/b/a Shellpoint is referred to herein as Shellpoint and/or SLS interchangeably for the purposes of liability.

32.    Defendant The Bank of New York Mellon is the holder of Ms. Hodges's loan and, upon information and belief, numerous other second mortgages serviced by Shellpoint. BNYM has a principal business address of 101 Barclay Street, 4W New York, NY 10007.

## FACTS

### *Zombie Second Mortgages*

33.    This case arises from the recent wave of attempts to collect "zombie" second mortgages, which were largely originated before the foreclosure crisis of 2008.

34.     Many consumers during the foreclosure crisis filed for bankruptcy, which eliminated their personal liability for paying their second mortgage. The lien on their home remained, however, meaning that if they did not continue paying their mortgage, the lender could foreclose on their home.

35.     Despite that TILA, Regulation Z, and Massachusetts law require monthly mortgage statements to be sent to consumers, SLS had a standard policy of not sending monthly statements to consumers who filed for bankruptcy.

36.     Without the monthly statements, many post-bankruptcy consumers did not understand that they had to continue paying their second mortgage to avoid foreclosure.

37.     Because the liens were still underwater following the bankruptcy, investors and servicers did not attempt to collect the outstanding loan balances through foreclosure. Instead, the loans stayed dormant and were sold—often several times—to various debt buyers and subprime lenders.

38.     And even though it was not sending the legally required monthly mortgage statements, SLS continued to assess interest charges and fees to the HELOCs each month, causing the balances to balloon without giving consumers notice of the rapidly increasing balance.

39.     In Ms. Hodges's case, for example, SLS and now Shellpoint have assessed approximately $100,000 in improper interest and charges to Ms. Hodges's loan, which Defendants are now seeking to collect through the foreclosure of her home.

40.     When companies like Defendants fail to provide regular monthly billing statements, they deprive homeowners of the ability to make payments, organize their budgets for regular payments, catch up when they fall behind, and identify and dispute errors on their accounts when they occur, which in turn would prevent the cascading effect of wrongful charges.

41.     Further, when companies like Defendants attempt to collect and actually collect these improper charges, including through foreclosure, they not only rob consumers of their homes, but they also strip them of tens of thousands of dollars in equity—one of the primary ways that low- and middle-income families build wealth.

### *Ms. Hodges's Zombie Second Mortgage*

42.     In March 2005, Ms. Hodges obtained a HELOC second mortgage secured by her home in Plymouth, Massachusetts.

43.     Ms. Hodges's second mortgage had an initial principal balance of $100,000.

44.     Ms. Hodges made payments on her HELOC until October 2007, when she suffered financial difficulties and could no longer afford the monthly payments.

45.     Due to her ongoing financial struggles, Ms. Hodges filed for Chapter 7 bankruptcy and received a discharge on December 11, 2008. Ms. Hodges retained the home and continues to live there.

46.     At the time of the discharge, the balance on Ms. Hodges's second mortgage was just under $100,000.

47.     After the bankruptcy, Ms. Hodges no longer received monthly statements for her second mortgage.

48.     SLS assumed the servicing rights to Ms. Hodges's second mortgage on October 1, 2013.

49.     The loan was in default at the time SLS became the servicer, as Ms. Hodges had not made any payments towards the mortgage since October 2007.

50.     Ms. Hodges heard nothing from SLS regarding her second mortgage until January 2024—she received no monthly statements or other correspondence that claimed she owed any amounts on the loan.

51.     The first time Ms. Hodges heard from a servicer about her second mortgage was when she received a Notice of Default and Notice of Intent to Foreclose on January 23, 2024.

52.     This notice stated that Ms. Hodges needed to pay $152,820.46 to cure the arrearage on her HELOC or her home would be referred to foreclosure.

53.     The amount listed on this letter included close to $100,000 in interest and fees that had been assessed when no one was sending Ms. Hodges monthly statements.

54.     Ms. Hodges was shocked when she received this notice. She did not think that there was any outstanding balance on her HELOC, let alone one with such a high amount due.

55.     Ms. Hodges had no way to know that SLS was assessing interest on her loan for times when it did not send statements prior to the correspondence dated January 23, 2024.

56.     Ms. Hodges wrote to SLS, which by this point had merged with Shellpoint. She explained that she hadn't received any communications about the loan other than the foreclosure notice and did not understand how she could be at risk of losing her home after nearly 15 years of silence. She also asked SLS/Shellpoint to explain how it had been charging her interest without sending her monthly mortgage statements.

57.     In response to Ms. Hodges's letter, Shellpoint confirmed that it had not sent Ms. Hodges any monthly mortgage statements because of her bankruptcy filing, but refused to remove any of the improper interest or fees from her account.

58.     Shellpoint's response also included a payoff quote, which reflected a total amount due of $200,090.51 on the HELOC, including $100,151.68 in interest.

59.     Following Ms. Hodges's letter to SLS/Shellpoint, Shellpoint started sending monthly mortgage statements to Ms. Hodges for her HELOC. Each of these statements show a total balance of more than $200,000 due on her HELOC, with a payment of more than $160,000 required to bring the loan current.

60.     SLS's and now Shellpoint's conduct, undertaken on behalf of BNYM, has caused considerable damage to Ms. Hodges, including interfering with her ability to restart payments after her bankruptcy discharge, making it impossible for her to modify her loan to avoid foreclosure before substantial arrears accrued, lost equity of approximately $100,000, as well as the significant stress that the pending foreclosure has caused her.

## CLASS ALLEGATIONS

61.     Under Federal Rule of Civil Procedure 23, Plaintiff brings this action for herself and on behalf of the following class of which she is a member:

> All consumers: (1) with a home equity line of credit serviced by SLS prior to Shellpoint's acquisition of the servicing rights to the loan; (2) whose home equity line of credit was discharged in bankruptcy; (3) to whom SLS did not send monthly mortgage statements after the consumer's bankruptcy discharge; and (4) against whom SLS, Shellpoint, or its agents have collected or attempted to collect late fees, default-related fees or interest assessed by SLS during the time periods when SLS did not send the consumer monthly mortgage statements.

62.     Plaintiff further brings this action on behalf of the following subclasses each of which she is a member:

> a.  TILA Subclass: All members of the class whose HELOCs are owned by BNYM and to whom the consumer was not sent a monthly mortgage statement until within the past year.

> b.  Massachusetts Subclass: All members of the class whose loans are secured by property located within Massachusetts and either (a) to whom the consumer was not sent a monthly mortgage statement until within the past four years *or* (b) against whom SLS,

Shellpoint, or its agents have collected or attempted to collect within the past four years.

63.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. Upon information and belief, SLS/Shellpoint services thousands of discharged HELOCS and subjects all of them to the same procedures for the assessment of interest and transmittal of monthly billing statements. Upon information and belief, BNYM owns thousands of mortgage loans, including tranches of HELOCs serviced by Shellpoint. Upon information and belief, more than forty of the homes securing these loans are located in Massachusetts. The class members' names and addresses are identifiable through SLS/Shellpoint's internal business records, and they may be notified of this litigation by published or mailed notice.

64.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Shellpoint and/or BNYM violated and are violating the Truth in Lending Act; (2) whether Shellpoint and/or BNYM are liable for their violations of Truth in Lending Act; (3) whether Shellpoint and/or BNYM violated and are violating Massachusetts law; (4) whether Shellpoint and/or BNYM are liable for violations of Massachusetts law; (5) the proper remedies for Defendants' legal violations.

65.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. She is also entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

66. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4)**. Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the class members that she seeks to represent. Plaintiff has retained counsel competent and experienced in consumer class-action litigation, and they intend to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

67. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

## CLASS CLAIMS FOR RELIEF

### COUNT ONE:
### Declaratory Judgment Under 28 U.S.C. § 2201
### (On Behalf of Plaintiff and the Class)

68. Plaintiff incorporates the preceding allegations.

69.     Plaintiff and the putative class were not mailed regular periodic billing statements apprising them of the balances of their loans, in violation of federal and state law.

70.     As a result, Defendants prevented Plaintiff and the putative class members from knowing that they had any obligation on the loans after bankruptcy discharge and making any related decisions, including but not limited to making payments, identifying and disputing errors, or seeking modification of the loans.

71.     Defendants nonetheless are now attempting to collect interest and fees that they claim accrued during this period of time from Plaintiff and putative class members, under threat of foreclosure.

72.     Plaintiff and members of the class are subject to ongoing harm absent a declaration that interest and fees are waived and/or unenforceable, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

73.     The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the disputed interest and fees,

74.     Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the ongoing attempted imposition of the interest and fees.

75.     Accordingly, Plaintiff seeks a declaratory judgment that all interest and fees assessed to discharged HELOCs during any time in which SLS/Shellpoint or its predecessors-in-interest failed to provide periodic statements are waived and/or unenforceable.

**COUNT TWO:**
**Violation of TILA, 15 U.S.C. § 1637(6), 12 C.F.R. § 1026.7**
**(On Behalf of Plaintiff and the TILA Subclass, as Against BONY)**

76.    Ms. Hodges incorporates the preceding allegations.

77.    Shellpoint, on behalf of BNYM, violated § 1637(b) of TILA and § 1026.7 of Regulation Z by failing to send to Plaintiff and the putative class members periodic statements for each billing cycle.

78.    BNYM, itself or throughts its agents, was obligated to send Plaintiff and the putative class members periodic statements under 15 U.S.C. § 1637(b) and 12 C.F.R. § 1026.7.

79.    Despite this requirement, SLS's policies and procedures prevented the sending of statements to Plaintiff and the putative class members whose debts had been discharged through bankruptcy.

80.    Defendants' failure to provide periodic billing statements is visible from the face of the loan files at issue.

81.    Plaintiff and the putative class members suffered a concrete injury in fact because of Defendants' failure to send statements, including, for example, the assessment of retroactive interest and fees that they had no ability to prevent from accumulating, emotional distress from the threatened foreclosure and loss of their homes and the attempted collection of vastly inflated debts, and the lost equity in their homes.

82.    In addition, some class members suffered actual damages when they paid improper interest and fees to Defendants for periods in which they did not receive statements.

83.    Under 15 U.S.C. § 1640, Plaintiff seeks actual and statutory damages for herself and each putative class member, as well as her reasonable attorneys' fees and costs. Plaintiff also

seeks actual damages for class members in the amount of the improper amounts paid to Defendants.

## COUNT THREE:
### Violations of Consumer Protection Act, Mass. Gen. Laws ch. 93A
### (On Behalf of Plaintiff and the Massachusetts Subclass)

84.    Ms. Hodges incorporates the preceding allegations.

85.    Shellpoint and BNYM are engaged in trade or commerce as defined by Mass. Gen. Laws ch. 93A § 1.

86.    Defendants' conduct as described herein, namely, systematically and as a matter of routine practice failing to provide periodic billing statements to consumers for extended periods of time and then, suddenly, attempting to collect years' worth of accrued interest and fees in addition to the principal obligations that were not actually owed, under direct or implied threat of foreclosure, constitutes an unfair and/or deceptive trade or practice in violation of Mass. Gen. Laws ch. 93A § 2.

87.    Plaintiff and the putative class members suffered a concrete injury in fact because of Shellpoint's and SLS's failure to send statements, including, for example, the assessment of retroactive interest and fees that they had no ability to prevent from accumulating, emotional distress from the threatened foreclosure and loss of their homes and the attempted collection of vastly inflated debts, and the lost equity in their homes.

88.    In addition, some class members suffered actual damages when they paid improper interest and fees to Defendants for periods in which they did not receive statements.

89.    In accordance with Mass. Gen. Laws ch. 93A, § 9, Plaintiff provided a written demand for relief identifying Plaintiff and reasonably describing the unfair acts and practices and injury suffered, on or about September 12, 2024, to Defendants.

90.    Defendants did not respond to this demand.

91.    Defendants' violations of Mass. Gen. Laws ch. 93A, § 2 and their failure to respond in good faith to Plaintiff's demand were knowing and willful.

92.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiff, for herself and each class member, seeks actual damages; statutory damages; treble damages; reasonable attorneys' fees and costs; equitable relief ending the illegal practices; and such other relief as the Court deems equitable and just.

**COUNT FOUR:**
**Violations of Massachusetts Debt Collection Regulations,**
**209 CMR 18.18, .19, .23, .24, and Mass. Gen. Laws, ch. 93A**
**(On Behalf of Plaintiff and the Massachusetts Subclass)**

93.    Ms. Hodges incorporates the preceding allegations.

94.    Shellpoint is a debt collector and a third party loan servicer as defined by 209 CMR 18.02.

95.    BNYM is a creditor and a debt collector as defined by 209 CMR 18.02.

96.    Ms. Hodges and the members of the class are consumers as defined by 209 CMR 18.02.

97.    Massachusetts and federal law require periodic billing statements to be sent to Ms. Hodges and the class members. *See* Mass. Gen. Laws ch. 140D, §§ 18, 19L 15 U.S.C. § 1637(b); 12 C.F.R. § 1026.7.

98.    Interest and fees may not be added to accounts for periods of time in which periodic billing statements are not provided. *See* Mass. Gen. Laws ch. 140D, § 19(a).

99.    Despite the requirements to send regular and timely billing statements, SLS's policies and procedures prevented the sending of statements to Plaintiff and the putative class members whose debts had been discharged through bankruptcy.

17

100.    Defendants thus failed to provide periodic billing statements to Ms. Hodges and class members.

101.    Defendants further added fees and interest for the periods in which no statements were sent and attempted to collect these improper and illegal amounts from Ms. Hodges and class members, including under threat of foreclosure.

102.    Defendants violated Massachusetts debt collection regulations by their conduct as alleged, including without limitation:

a.      By using false, deceptive, or misleading representations or means in connection with the collection of debt, including without limitation by misrepresenting the character and amount of the debt, in violation of 209 CMR 18.18;

b.      By using unfair or unconscionable means to collect or attempt to collect on the debts at issue, including without limitation by attempting to collect amounts that are not permitted by law, in violation of 209 CMR 18.19;

c.      By using unfair or unconscionable means in servicing the loans at issue, including without limitation by misrepresenting material information about the loan, in violation of 209 CMR 18.23; and

d.      By using unfair or unconscionable means in servicing the mortgage loans at issue, in violation of 209 CMR 18.24.

103.    Plaintiff and the putative class members suffered a concrete injury in fact because of Defendants' failure to send statements, including, for example, the assessment of retroactive interest and fees that they had no ability to prevent from accumulating, emotional distress from the threatened foreclosure and loss of their homes and the attempted collection of vastly inflated debts, and the lost equity in their homes.

104.    In addition, some class members suffered actual damages when they paid improper interest and fees to Defendants for periods in which they did not receive statements.

105.    Pursuant to 209 CMR 18.27, Defendants' violations of the Consumer Credit Cost Disclosure Act constitute per se violations of Mass. Gen. Laws ch. 93A, § 2.

106.    In accordance with Mass. Gen. Laws ch. 93A, § 9, Plaintiff provided a written demand for relief identifying Plaintiff and reasonably describing the unfair acts and practices and injury suffered, on or about September 12, 2024, to Defendants.

107.    Defendants did not respond to this demand.

108.    Defendants' violations of Mass. Gen. Laws ch. 93A, § 2 and their failure to respond in good faith to Plaintiff's demand were knowing and willful.

109.    Plaintiff, for herself and each class member, seeks actual damages; statutory damages; treble damages; reasonable attorneys' fees and costs; equitable relief ending the illegal practices; and such other relief as the Court deems equitable and just.

### COUNT FIVE:
**Violations of Consumer Credit Cost Disclosure Act,
Mass. Gen. Laws ch. 140D, §§ 11, 19, 32, 34 & Mass. Gen. Laws ch. 93A
(On Behalf of Plaintiff and the Massachusetts Subclass, as Against BNYM Only)**

110.    Ms. Hodges incorporates the preceding allegations.

111.    Ms. Hodges is a consumer as defined by Mass. Gen. Laws ch. 140D, § 1, because she entered a transaction in which credit was extended, and the money, property, or services which was the subject of the transactions was primarily for personal, family, or household purposes.

112.    BNYM is the assignee of the original creditor.

113.    The failure to provide periodic billing statements was and is apparent on the face of the documents, such that BNYM is subject to liability pursuant to Mass. Gen. Laws ch. 140D, § 33.

114.    Defendant BNYM, through its agents, failed to send to Plaintiff and the putative class members periodic statements for each billing cycle. This conduct violated Mass. Gen. Laws ch. 140D, §§ 11 and 19.

115.    Despite the requirements to send regular and timely billing statements, SLS's policies and procedures prevented the sending of statements to Plaintiff and the putative class members whose debts had been discharged through bankruptcy.

116.    Shellpoint and/or SLS assessed fees and interest on behalf of BNYM for months in which it did not send timely periodic statements under Mass. Gen. Laws ch. 140D, § 19(a).

117.    BNYM did not timely refund or credit customers for the fees and interest assessed, as required by Mass. Gen. Laws ch. 140D, § 19(a).

118.    Plaintiff and the putative class members suffered a concrete injury in fact because of the failure to send statements, including, for example, the assessment of retroactive interest and fees that they had no ability to prevent from accumulating, emotional distress from the threatened foreclosure and loss of their homes and the attempted collection of vastly inflated debts, and the lost equity in their homes.

119.    In addition, some class members suffered actual damages when they paid improper interest and fees to BNYM for periods in which they did not receive statements.

120.    Pursuant to Mass. Gen. Laws ch. 140D, § 34, the violations of the Consumer Credit Cost Disclosure Act constitute a per se violation of Mass. Gen. Laws ch. 93A.

121.    In accordance with Mass. Gen. Laws ch. 93A, § 9, Plaintiff provided a written demand for relief identifying Plaintiff and reasonably describing the unfair acts and practices and injury suffered, on or about September 12, 2024, to Defendant BNYM.

122.    Defendant BNYM did not respond to this demand.

20

123.    Defendant's violations of Mass. Gen. Laws ch. 93A, § 2 and its failure to respond in good faith to Plaintiff's demand were knowing and willful.

124.    Pursuant to Mass. Gen. Laws ch. 140D, §§ 19(a), 32, and 34 and Mass. Gen. Laws ch. 93A, § 11, Plaintiff, for herself and each class member, seeks actual damages; statutory damages; treble damages; reasonable attorneys' fees and costs; equitable relief ending the illegal practices; and such other relief as the Court deems equitable and just.

**WHEREFORE**, Plaintiff respectfully requests, on behalf of herself and the class, actual damages; statutory damages; treble damages; declaratory, injunctive, and equitable relief; attorneys' fees and costs; pre- and post-judgment interest at the legal rate; and any other relief that the Court finds appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,
**EVA HODGES,**
On behalf of herself and all others similarly situated,

By:____/s/ Shennan Kavanagh_____
Shennan Kavanagh (BBO #655174)
Jennifer Wagner (*BBO # & D. Mass. Admission forthcoming*)
National Consumer Law Center
7 Winthrop Square, 4th Floor
Boston, MA 02110
Telephone: (617) 542-8010
skavanagh@nclc.org
jwagner@nclc.org

Kristi C. Kelly (*pro hac vice forthcoming*)
KELLY GUZZO, PLC
3925 Chain Bridge, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com

*Counsel for Plaintiff*

21