**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Eastern Division**

| | |
|---|---|
| EVA HODGES, *on behalf of herself and all others similarly situated*,<br><br>        Plaintiff,<br><br>v.<br><br><br>NEWREZ, LLC d/b/a SHELLPOINT MORTGAGE SERVICING, and THE BANK OF NEW YORK MELLON,<br><br>        Defendants. | Civil Action No. 1:25-cv-10147-ABD |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff Eva Hodges ("Plaintiff" or "Ms. Hodges"), individually and on behalf of all others similarly situated, through her undersigned counsel, files this Second Amended Class Action Complaint against Newrez, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") and Bank of New York Mellon ("BONY") and alleges as follows:

## INTRODUCTION

1.    In this case, Defendant Shellpoint and its predecessor in interest, Specialized Loan Servicing, LLC ("SLS")[1], systematically and as a matter of policy, provided no ongoing

---

[1] Shellpoint acquired SLS in late 2023, and SLS was merged into Shellpoint in early 2024. *See* Rithm Capital Corp. Form 10-K at 8 (May 2, 2024); *Rithm Capital to Acquire Specialized Loan Servicing LLC*, Businesswire (Oct. 2, 2023), https://www.businesswire.com/news/home/20231001340340/en/Rithm-Capital-to-Acquire-Specialized-Loan-Servicing-LLC.

Throughout this complaint, unless otherwise noted, SLS and Shellpoint are used interchangeably to refer to the defendant Newrez, LLC.

information to homeowners about their loans or payments for over a decade, only reappearing to suddenly threaten foreclosure if the homeowner failed to "reinstate" a purported default of tens of thousands of dollars.

2.      Eva Hodges, who brings this case on behalf of herself and all other similarly situated consumers, had a first and a second mortgage in 2008. During the 2008 foreclosure crisis, Ms. Hodges, like many others, filed for bankruptcy to escape financial ruin and obtain a fresh start financially. Bankruptcy eliminated their personal liability for paying their second mortgage. Many homeowners were unaware, however, that the second mortgage lien on their home remained, meaning that if they did not continue paying their mortgage, they could lose their home to foreclosure.

3.      Although she had previously received regular billing statements and other communications about her second mortgage, after her 2008 bankruptcy discharge, Ms. Hodges received no billing statements or other communications about her second mortgage. Instead, Ms. Hodges received nothing indicating that interest or other fees were accruing on her second mortgage, what her monthly payment was, to whom these amounts were owed, or how to pay them.

4.      Instead, SLS (which took over Ms. Hodges's loan in 2013) had a uniform policy and procedure of not sending monthly statements to borrowers whose loans had been discharged in bankruptcy. As a result, Ms. Hodges—and other homeowners like her—received no information about how much they owed until over a decade later, when Shellpoint suddenly contacted her, stating that she owed interest and fees of over $100,000—approximately double her original loan balance—and that she needed to pay over $150,000 in past due payments, interest, and fees within thirty-three days to avoid foreclosure.

2

5.      Defendants' conduct deprived Ms. Hodges and class members of the ability to budget, understand amounts that they purportedly owed, contest improper amounts claimed due, or seek a loan modification or other foreclosure alternative before purported arrears accrued over the course of years to a default they would never be able to cure and avoid foreclosure.

6.      To avoid the exact circumstance Ms. Hodges and the other class members now face, mortgage contracts, industry standards, and the policies set forth by Congress and the Massachusetts Legislature require mortgage companies to provide basic and ongoing information to borrowers about amounts owed, interest rates, and how to make payments. This is particularly important for Home Equity Lines of Credit (HELOCs), given that the amount that a person might owe will change with the amount drawn and variable interest rates. Without this information, a borrower like Ms. Hodges has no ability to understand what she owes or even how to make payments—and thereby avoid default and foreclosure.

7.      Ms. Hodges brings this suit to save her home of many years, and the homes of others, from foreclosure due to Defendants' unfair, deceptive, and unconscionable conduct.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1336 because this case arises under federal law that regulates commerce.

9.      This Court also has jurisdiction under 28 U.S.C. § 1332 because this is a class action in which the amount in controversy exceeds the value of $5,000,000, and the class has citizenship different from any defendant; and because the plaintiff and defendants are citizens of different States and the amount in controversy exceeds $75,000.

3

10.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that establish this Complaint occurred in this District and Division, where Ms. Hodges resides.

## PARTIES

11.    Plaintiff Eva Hodges is a natural person residing in Plymouth, Massachusetts.

12.    Defendant Newrez, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") is a limited liability company organized under the laws of Delaware.  Shellpoint is the successor-in-interest to SLS by virtue of the acquisition of SLS by Shellpoint's parent company, Rithm Capital, and the merger of SLS with Shellpoint, effective May 1, 2024. Defendant Newrez, LLC d/b/a Shellpoint is referred to herein as Shellpoint and/or SLS interchangeably for the purposes of liability.

13.    Shellpoint is a debt collector under the FDCPA, 15 U.S.C. § 1692a(6), because it treated Plaintiff's loan as in default at the time it acquired the loan's servicing rights. *See Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 362 (6th Cir. 2012); *Schlosser v. Fairbanks Cap. Corp.*, 323 F.3d 534, 537–38 (7th Cir. 2003). Indeed, Shellpoint identified itself as a debt collector on the correspondence that it sent to Plaintiff. Shellpoint regularly collects debts on behalf of owners of mortgage loans.

14.    Defendant The Bank of New York Mellon (BNYM) is the holder and assignee of Ms. Hodges's loan and, upon information and belief, numerous other second mortgages serviced by Shellpoint. BNYM has a principal business address of 101 Barclay Street, 4W New York, NY 10007.

## FACTS

### *Mortgage Loan Servicing & Borrower Communication*

15.    Mortgage lenders and their assignees, including BNYM, typically delegate their mortgage servicing responsibility to mortgage servicers like SLS and Shellpoint.

16.    The standard practice in the mortgage servicing industry is for mortgage servicers to provide information to borrowers about the status of their loan accounts on a regular basis, and to increase the frequency of communications when a loan is in default.

17.    These requirements have been long-standing in the industry, but in the wake of the 2008 foreclosure crisis, the requirements became more widespread and rigorous to advance the public policy of ensuring that homeowners are not improperly and unjustly deprived of their wealth and their homes.

18.    The major insurers of home mortgages, including the Government Sponsored Enterprises (Fannie Mae and Freddie Mac), the Federal Housing Administration ("FHA"), the Veterans Administration ("VA"), and the Rural Housing Service ("RHS"), regularly publish guidelines for their servicers. These servicing guidelines direct mortgage servicers to provide information to borrowers about the status of their loans on a regular basis, and particularly when a loan is in default. These guidelines apply to most residential mortgages in the United States and set an industry standard for continuity of contact with borrowers that mortgage servicers routinely follow.

19.    The industry practice that servicers regularly provide borrowers with material information about their loans has been reinforced by a body of federal and state laws created to ensure that borrowers are kept informed about the status of their mortgage loans, such as the Real

5

Estate Settlement Procedures Act, the Truth in Lending Act, and the Massachusetts Consumer Cost Disclosure Act. Pursuant to federal and state laws, borrowers must receive notices of changes in interest rates, shortages or surpluses in escrow accounts, default or acceleration of the loan, the availability of loss mitigation, and periodic statements about the status of the account. *See, e.g.*, 15 U.S.C. § 1637(b); 12 C.F.R. 1024.30-41; Mass. Gen. Laws ch. 140D, §§ 11(b), 19(a).

20.    Many contracts, including Ms. Hodges's, incorporate these requirements, including explicitly requiring the provision of monthly periodic billing statements that "show all Account activity during the billing cycle and contain other important information including [the] 'New Balance,' [the] Annual Percentage Rate, the amount of [the] 'Minimum Payment Due,' [the] 'Payment Due Date' and the place and manner of making payments." Home Equity Credit Line Agreement and Disclosure Statement ¶ 3.B.

21.    The Consumer Financial Protection Bureau ("CFPB") has also stated that times of default are "precisely when a consumer most needs the periodic statement" to "document fees and charges to the consumer."[2] Simply put, "as long as such charges may be assessed, the consumer is entitled to receive a periodic statement."[3]

22.    These requirements evince a common purpose and a policy adopted by, *inter alia*, the Massachusetts Legislature, of ensuring that borrowers, regardless of their level of sophistication, can make informed decisions about their obligations under mortgage agreements, including the basic knowledge of how much the homeowners owes, to whom, and how to make their payments.

---

[2]  12 C.F.R. Part 1026 (CFPB Official Interpretations), https://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-tila.pdf (last visited Oct. 2, 2024).
[3] *Id.*

23.     The accrual of interest and fees on a home mortgage loan involves highly technical calculations, particularly when an open-end credit transaction like a HELOC is involved.

24.     A mortgage servicer's suspension of communication with borrowers—particularly when it extends over several years and when the loan is in default—is a significant deviation from standard industry practice and contrary to the intent and purpose of federal and state laws, and it causes concrete harm to borrowers.

25.     Because of a servicer's long-term suspension of communication, a borrower cannot make reasonable, informed decisions about how to meet ongoing payment obligations. A servicer's protracted inaction leaves the borrower without materially significant information about the loan account, including:

    a.     The amount of the next installment payment coming due;

    b.     Where to send the payment;

    c.     When the payment is due;

    d.     To whom the next installment due is payable;

    e.     The identity of the current servicer;

    f.     The identity of the current loan owner;

    g.     The extent of accumulated arrearages, including accrued and unpaid interest and any default-related charges;

    h.     The consequences of any current default, including whether acceleration or foreclosure are imminent.

26.     While a mortgage loan is in default, a servicer's abandonment of communication significantly impairs a borrower's ability to make informed decisions about how to cure the default and resume scheduled payments, including:

a.     Whether and how to request loss mitigation assistance, such as a payment plan, loan modification, or other foreclosure alternative;

b.     Whether to seek assistance from available governmental programs;

c.     Whether to seek a refinance of the obligation, particularly in the case of a second mortgage;

d.     Whether to seek bankruptcy relief, including repayment of arrears through a chapter 13 plan;

e.     Whether to seek a negotiated sale of the property to pay off the mortgage and recover any remaining equity in the property.

27.     A servicer's long-term abandonment of communications leads borrowers to a reasonable belief that the loan has been written off, discharged, or modified.

28.     Because borrowers reasonably believe that they no longer have an ongoing payment obligation, they miss opportunities to cure or otherwise address a mortgage default.

29.     For example, during the COVID-19 pandemic the Commonwealth of Massachusetts allocated $178 million to mortgagors in the state under the Homeowners Assistance Fund ("HAF") program.  Borrowers with second mortgages in default were eligible to receive grants of up to $50,000 toward reinstatement of their loans. The application period for the Massachusetts HAF program ended on June 30, 2023.

30.     Borrowers who had a reasonable belief that their mortgage loan had been discharged many years ago lost the opportunity to apply for a HAF grant that could have paid off or substantially reduced a mortgage debt.

*Zombie Second Mortgages & SLS's Policy of Withholding Essential Information*

31.    This case arises from the recent wave of attempts to collect "zombie" second mortgages, which were largely originated before the foreclosure crisis of 2008.

32.    Many consumers during the foreclosure crisis filed for bankruptcy, which eliminated their personal liability for paying their second mortgage. The lien on their home remained, however, meaning that if they did not continue paying their mortgage, the lender could foreclose on their home.

33.    Often, for a long period of time after the homeowner's bankruptcy, the creditors would cease collection and communications with the homeowners and write off the debts entirely for second mortgages. This was because home values had crashed dramatically during the crisis, and foreclosure would not yield any return on a second mortgage after a first mortgage was paid off. Because of this, these debts were often sold for pennies on the dollar—often several times— to various debt buyers and subprime collectors which understood that there was little likelihood of ever collecting. Meanwhile, homeowners went on with their lives.

34.    The CFPB has explained the problem of zombie second mortgages:

Leading up to the 2008 financial crisis, many lenders originated mortgages to consumers without considering their ability to repay the loans. … One common piggyback mortgage product, known as an 80/20 loan, involved a first lien loan for 80 percent of the value of the home and a second lien loan for the remaining 20 percent of the valuation. … [In the event of default,] the second mortgage holder only receives proceeds from the foreclosure sale if there are any funds left after paying off the first mortgage. As a result, many second mortgage holders of piggyback loans, recognizing that a foreclosure would not generate enough money to cover even the first mortgage, charged their defaulted loans off as uncollectible and ceased communicating with the borrowers. … Many borrowers, having not received any notices or periodic statements for years, concluded that their second mortgages had been modified along with the first mortgage, discharged in bankruptcy, or forgiven. In recent years, as home prices have increased and borrowers have paid down their first mortgages, after years of silence, some borrowers are hearing from companies that claim to own or have the right to collect on their long-dormant second mortgages. These companies often demand the

outstanding balance on the second mortgage, plus fees and interest, and threaten to foreclose if the borrower does not or cannot pay. [4]

35.    Indeed, despite contractual and other legal requirements, SLS had a uniform practice and procedure of not communicating with homeowners about their loans—including not providing the periodic statements that would advise that they owed money, how much they owed, or how to make payments.

36.    Without any communications from the lenders or servicers, including no monthly statements, many post-bankruptcy consumers did not understand that they had to continue paying their second mortgage to avoid foreclosure.

37.    Even though it abandoned communicating with borrowers about the loans year after year, SLS continued to assess interest charges and fees to the HELOCs each month, causing the balances to balloon.

38.    In Ms. Hodges's case, for example, SLS and now Shellpoint have assessed approximately $100,000 in interest and charges to Ms. Hodges's loan, which they are now seeking to collect through the foreclosure of her home.

39.    When companies like SLS and Shellpoint fail to provide ongoing account information, they deprive homeowners of the ability to make payments, organize their budgets for regular payments, and catch up when they fall behind.

40.    Now, SLS and Shellpoint are attempting to collect substantial accrued unpaid interest, fees and charges from consumers, including by sending acceleration notices that demand these previously undisclosed amounts under threat of foreclosure of their homes.

---

[4] Consumer Financial Protection Bureau, Advisory Opinion re: 12 C.F.R. Part 1006 (2023), https://files.consumerfinance.gov/f/documents/cfpb_regulation-f-time-barreddebtadvisory-opinion_2023-04.pdf.

41.     When companies like SLS and Shellpoint attempt to collect and actually collect these inflated charges, including through foreclosure, they not only force consumers out of their homes, but they also strip them of tens of thousands of dollars in equity—one of the primary ways that low- and middle-income families build wealth.

### *Ms. Hodges's Zombie Second Mortgage*

42.     Ms. Hodges's experience is typical of homeowners with HELOC second mortgages serviced by SLS.

43.     In March 2005, Ms. Hodges obtained a HELOC second mortgage secured by her home in Plymouth, Massachusetts, with an initial principal balance of $100,000.

44.     Ms. Hodges's form contract included the following requirements (with "you" defined as the lender or its assignee and "I" and "my" defined as the borrower):

> At a minimum, you will send me a periodic statement monthly, except that my first periodic statement may be generated and mailed to me between thirty and sixty days after I open my Account. The periodic statement will show all Account activity during the billing cycle and contact other important information, including my "New Balance," my Annual Percentage Rate, the amount of my "Minimum Payment Due," my "Payment Due Date" and the place and manner of making payments.

45.     This was an essential term of the contract because for HELOCs the amount that a person might owe will change with the amount drawn and variable interest rates. Without this information, a borrower like Ms. Hodges has no ability to understand what she owes or even how to make payments.

46.     Consistent with the terms of her contract, industry practice, and state and federal laws, after entering the loan, Ms. Hodges received monthly billing statements setting forth her balance, interest rate, payment due, due date, and the location to send her payments.

47.    In accordance with industry standards, each of Ms. Hodges's mortgage lenders delegated their responsibility to send Ms. Hodges monthly mortgage statements to her mortgage servicers.

48.    Ms. Hodges made payments on her HELOC until October 2007, when she suffered financial difficulties and could no longer afford the monthly payments.

49.    Due to her ongoing financial struggles, Ms. Hodges filed for Chapter 7 bankruptcy and received a discharge on December 11, 2008.

50.    At the time of the discharge, the balance on Ms. Hodges's second mortgage was just under $100,000.

51.    After her bankruptcy discharge, Ms. Hodges no longer received monthly statements for her second mortgage.

52.    BNYM purchased Ms. Hodges's second mortgage on June 12, 2013.

53.    SLS assumed the servicing rights to Ms. Hodges's second mortgage on October 1, 2013.

54.    The loan was in default at the time that BNYM purchased the loan and when SLS became the servicer, as Ms. Hodges had not made any payments towards the mortgage since October 2007.

55.    In keeping with its uniform policy and procedure of not sending monthly statements to borrowers whose loans were discharged in bankruptcy, and despite the requirements of the contract and other applicable law and practice, SLS never sent Ms. Hodges monthly mortgage statements.

56.    Ms. Hodges heard nothing from SLS regarding her second mortgage until January 2024—she received no monthly statements or other correspondence that claimed she owed any amounts on the loan.

57.    As a result, Ms. Hodges heard nothing about her second mortgage for more than a decade.

58.    Statements, of course, would have periodically apprised Ms. Hodges of the balance of her loan, including interest that was supposedly still accruing after discharge and charge-off of the loan in 2008. Statements were especially critical because Ms. Hodges was at risk of losing her home through foreclosure.

59.    The first time Ms. Hodges heard from a servicer about her second mortgage since her bankruptcy was when she received a Notice of Default and Notice of Intent to Foreclose on January 23, 2024, from Shellpoint, an entity she had never heard of or from before.

60.    This notice stated that Ms. Hodges needed to pay $152,820.46 to bring her second mortgage current and that Shellpoint could foreclose on her home if she did not pay this amount. This amount included, in addition to approximately $50,000 for purportedly late principal payments, close to $100,000 in interest and fees that it claimed had accrued during the sixteen years that no one was communicating with Ms. Hodges about the loan, and during which period SLS had neither advised her that the loan not only continued to exist, but to purportedly accrue interest.

61.    This acceleration letter was an attempt to collect a debt because it informed Ms. Hodges that if she did not pay the amount listed on the letter, Shellpoint "retained the right to enforce the lien against the collateral property"—i.e., foreclose on her home. Ms. Hodges was

shocked when she received this notice. She did not think that there was any outstanding balance on her HELOC, let alone one with such a high amount due.

62.    Ms. Hodges wrote to Shellpoint and explained that she hadn't received any communications about the loan other than the foreclosure notice and did not understand how she could be at risk of losing her home or owing this much money after nearly fifteen years of silence.

63.    In response to Ms. Hodges's letter, Shellpoint confirmed that it, and its predecessor SLS, had not sent Ms. Hodges any communications informing her of the status of her loan because of her bankruptcy filing. Shellpoint refused to take any corrective action or provide Ms. Hodges any relief that would allow her to keep her home.

64.    Instead, Shellpoint stated that Ms. Hodges did not qualify for a loan modification that would allow her to make payments and keep her home because the purported delinquency was too high. Of course, the purported delinquency was too high because it had accrued over the course of years in which Defendants withheld all information about the loan from Ms. Hodges, depriving her the key information necessary to make payments or seek alternative solutions like an affordable loan modification before the arrears grew.

65.    Shellpoint's response also included a payoff quote, which reflected a total amount due of $200,090.51 on the HELOC, including $100,151.68 in interest.

66.    Following Ms. Hodges's letter to SLS/Shellpoint, Shellpoint started sending monthly mortgage statements to Ms. Hodges for her HELOC. Each of these statements show a total balance of more than $200,000 due on her HELOC, and stated the amount of a past due payments were more than $160,000 (including interest, fees, and past due principal).

67.    SLS's and now Shellpoint's conduct, undertaken on behalf of BNYM, has caused considerable damage to Ms. Hodges, including interfering with her ability to restart payments after

her bankruptcy discharge, impairing her ability to modify or refinance her loan to avoid foreclosure before substantial arrears accrued, diminishing the value of her equity in the property, as well as the significant stress that the pending foreclosure has caused her.

## CLASS ALLEGATIONS

68.     Under Federal Rule of Civil Procedure 23, Plaintiff brings this action for herself and on behalf of the following class of which she is a member:

> All Massachusetts consumers: (1) with a home equity line of credit serviced by SLS prior to Shellpoint's acquisition of the servicing rights to the loan; (2) whose loan was discharged in bankruptcy; (3) with whom SLS did not mail regular communications after the consumer's bankruptcy discharge; and (4) against whom SLS, Shellpoint, or its agents have collected or attempted to collect late fees, default-related fees or interest assessed for time periods when SLS had abandoned communication with the consumers about the loans.

69.     Plaintiff further brings this action on behalf of the following subclasses each of which she is a member:

    a.  <u>Massachusetts Claim Subclass</u>: All members of the class whose homes are located in Massachusetts and either (a) SLS, Shellpoint or its agents did not provide ongoing account information within the past four years *or* (b) against whom SLS, Shellpoint, or its agents have collected or attempted to collect within the past four years.

    b.  <u>FDCPA Subclass</u>: All members of the class (a) whose loan was in default when SLS became the servicer of the loan and (b) who received form collection notices threatening foreclosure, including without limitation a Notice of Default and Notice of Intent to Foreclosure in a form similar to that received by Ms. Hodges, within one year preceding the filing of this case.

70.     **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. Upon information and belief, SLS/Shellpoint services thousands of discharged HELOCS and subjects all of them to

the same procedures for the assessment of interest, transmittal of monthly billing statements and other loan-related communications, and procedures for calculating the amount due in form acceleration notices. Upon information and belief, BNYM owns thousands of mortgage loans, including tranches of HELOCs serviced by Shellpoint. Upon information and belief, more than forty of the homes securing these loans are located in Massachusetts. The class members' names and addresses are identifiable through SLS/Shellpoint's internal business records, and they may be notified of this litigation by published or mailed notice.

71.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Shellpoint violated and is violating the Fair Debt Collection Practices Act; (2) whether Shellpoint is liable for its violations of the Fair Debt Collection Practices Act; (3) whether Shellpoint and/or BNYM violated and are violating Massachusetts law; (4) whether Shellpoint and/or BNYM are liable for violations of Massachusetts law; (5) the proper remedies for Defendants' legal violations.

72.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. She is also entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

73.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4)**. Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the class members that she seeks to represent. Plaintiff has retained counsel competent and experienced in consumer class-action litigation, and they intend to continue to

prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

74.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

### CLASS CLAIMS FOR RELIEF

### COUNT ONE:
### VIOLATION OF FDCPA, 15 U.S.C. § 1692e(10)
### (On Behalf of Plaintiff and the FDCPA Subclass, as Against Shellpoint)

75.    The portion of this claim alleging that Shellpoint misrepresented amounts due by attempting to collect interest in violation of state and federal law is repleaded to preserve Plaintiffs' right to appeal this Court's prior dismissal of that claim.

76.    Ms. Hodges incorporates the preceding allegations.

77.     Shellpoint violated § 1692e(10) of the FDCPA by using false representations and deceptive means to collect or attempt to collect debts from Ms. Hodges and the putative class members.

78.     For example, Shellpoint falsely represented that Ms. Hodges and the putative class members owed late fees and interest for the months that they were not sent monthly statements, contrary to 15 U.S.C. § 1637(b), Mass. Gen. Laws ch. 140D, and the contract, including in acceleration notices.

79.     These acceleration notices were an attempt to collect a debt because they threatened enforcement of Ms. Hodges's and the putative class members' liens (i.e., foreclosure) if the amounts listed in the acceleration notices were not paid.

80.     Shellpoint's statements were false in the acceleration notices were false because they listed an incorrect balance that included interest charges and late fees that were not owed under state and federal law.

81.     In addition, Shellpoint's policy of long-term abandonment of contact with borrowers and subsequent attempts to collect amounts that purportedly accrued over the years of no contact was a deceptive means to collect debts because it had the capacity to mislead borrowers about the status of alleged debts and substantially impaired borrowers' ability to make informed decisions about how to comply with any ongoing obligation to pay the debts.

82.     Plaintiff and the putative class members suffered a concrete injury in fact because of Shellpoint's practices and misrepresentations, including, for example, an immediate loss of equity in their home upon the imposition of ongoing charges, adverse impact on debt-related decision making, and the accrual of substantial arrears that could have otherwise been reasonably avoided and the resulting lost availability of foreclosure prevention options.

83.     In addition, some class members suffered actual damages when they paid improper interest and fees to Shellpoint for periods in which they did not receive statements.

84.     Under 15 U.S.C. § 1692k, Ms. Hodges seeks actual and statutory damages for herself and each putative class member and her reasonable attorneys' fees and costs. She also seeks actual damages for the class members in the amount of the improper fees that they paid to Shellpoint.

**COUNT TWO:**
**VIOLATION OF FDCPA, 15 U.S.C. § 1692f**
**(On Behalf of Plaintiff and the FDCPA Subclass, as Against Shellpoint)**

85.     Ms. Hodges incorporates the preceding allegations.

86.     Shellpoint violated § 1692f of the FDCPA by using unfair or unconscionable means to collect or attempt to collect debts from Ms. Hodges and the putative class members by sending acceleration notices to consumers after years of silence that threatened foreclosure if Ms. Hodges and the class members failed to pay amounts that included huge sums of interest and fees that it claimed accrued during the period in which Shellpoint provided no information about the loan or lien to the homeowners.

87.     The acceleration notices were an attempt to collect a debt because they threatened enforcement of Ms. Hodges's and the putative class members' liens (i.e., foreclosure) if the amounts listed in the acceleration notices were not paid.

88.     Shellpoint engaged in the practice of suspending communication with borrowers for extended periods of time and allowing the account balances to balloon with interest charges and other fees before informing consumers of the balance increases through acceleration notices.

89.     Abandoning communication regarding the loan with borrowers for years and then demanding a lump sum amount that often doubles the original loan balance due to interest, fees,

and costs that have allegedly accrued during those years of silence under threat of loss of a borrower's home is unfair and unconscionable.

90.    Shellpoint's unfair and unconscionable conduct causes harm to borrowers.

91.    Shellpoint's practice had the tendency to impair the ability of the least sophisticated consumers to make informed decisions about how to meet their payment obligations and keep their homes.

92.    Borrowers missed opportunities to forestall the accrual of interest and fees through loss mitigation, refinancing when the balance and interest rates were lower, and other available options.

93.    In addition to the loss of credit opportunity, Plaintiff and the putative class members suffered a concrete injury in fact because of Shellpoint's unfair or unconscionable practices, including, for example, including, for example, an immediate loss of equity in their home upon the imposition of these charges, adverse impact on debt-related decision making, and the accrual of substantial arrears that could have otherwise been reasonably avoided and the resulting lost availability of foreclosure prevention options.

94.    In addition, some class members suffered actual damages when they paid interest and fees to Shellpoint.

95.    Under 15 U.S.C. § 1692k, Ms. Hodges seeks actual and statutory damages for herself and each putative class member and her reasonable attorneys' fees and costs. She also seeks actual damages for the class members in the amount of the improper fees that they paid to Shellpoint.

**COUNT THREE:**
**Violations of Consumer Protection Act, Mass. Gen. Laws ch. 93A**
**(On Behalf of Plaintiff and the Massachusetts Claim Subclass, Against All Defendants)**

96.     Ms. Hodges incorporates the preceding allegations.

97.     Shellpoint and BNYM are engaged in trade or commerce as defined by Mass. Gen. Laws ch. 93A § 1.

98.     Defendants' conduct as described herein, namely, systematically and as a matter of routine practice suspending communication with borrowers for extended periods of time, thereby depriving homeowners of the ability to make informed decisions about their payment obligations and keep their homes; and then, suddenly, attempting to collect years' worth of undisclosed, purported accrued interest and fees in addition to the principal obligations under threat of foreclosure, constitutes an unfair and/or deceptive trade or practice in violation of Mass. Gen. Laws ch. 93A § 2.

99.     Defendants failed to adequately disclose relevant information about the loans in a manner that had the capacity and tendency to deceive consumers, in violation of 940 CMR 3.05(1).

100.     Defendants' conduct is contrary to the public policy of the state of Massachusetts to ensure that homeowners are reasonably apprised of amounts due on their debts and can reasonably avoid foreclosure.

101.     Plaintiff and the putative class members suffered a concrete injury in fact because of Defendants' failure to communicate, including, for example, including, for example, an immediate loss of equity in their home upon the imposition of these charges, adverse impact on debt-related decision making, and the accrual of substantial arrears that could have otherwise been reasonably avoided and the resulting lost availability of foreclosure prevention options.

102.    In addition, some class members suffered actual damages when they paid interest and fees to Defendants.

103.    In accordance with Mass. Gen. Laws ch. 93A, § 9, Plaintiff provided a written demand for relief identifying Plaintiff and reasonably describing the unfair acts and practices and injury suffered, on or about September 12, 2024, to Defendants.

104.    Defendants did not respond to this demand.

105.    Defendants' violations of Mass. Gen. Laws ch. 93A, § 2 and their failure to respond in good faith to Plaintiff's demand were knowing and willful.

106.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiff, for herself and each class member, seeks equitable relief including an order prohibiting enforcement of any claim for interest or fees alleged to have accrued during periods of non-communication, including through threat of enforcement of the lien on the property; actual damages; statutory damages; treble damages; reasonable attorneys' fees and costs; equitable relief remedying the illegal practices; and such other relief as the Court deems equitable and just.

**<u>COUNT FOUR:</u>**
**Violations of Massachusetts Debt Collection Regulations,**
**209 CMR 18.18, .19, .23, .24, and Mass. Gen. Laws, ch. 93A**
**(On Behalf of Plaintiff and the Massachusetts Claim Subclass, Against All Defendants)**

107.    Ms. Hodges incorporates the preceding allegations.

108.    Shellpoint is a debt collector and a third-party loan servicer as defined by 209 CMR 18.02.

109.    BNYM is a creditor and a debt collector as defined by 209 CMR 18.02.

110.    Ms. Hodges and the members of the class are consumers as defined by 209 CMR 18.02.

111.    Defendants' conduct of suspending communication with borrowers for extended periods of time and then suddenly attempting to collect vastly inflated amounts and pursuing foreclosure is deceptive, misleading, unfair, and/or unconscionable.

112.    Defendants violated Massachusetts debt collection regulations by their conduct as alleged, including without limitation:

a.    As to both BNYM and Shellpoint, by using unfair or unconscionable means to collect or attempt to collect on the debts at issue, in violation of 209 CMR 18.22;

b.    As to Shellpoint, by using unfair or unconscionable means in servicing the loans at issue, in violation of 209 CMR 18.40; and

c.    As to Shellpoint, by using unfair or unconscionable means in servicing the mortgage loans at issue, in violation of 209 CMR 18.41.

113.    Plaintiff and the putative class members suffered a concrete injury in fact because of Defendants' failure to communicate and subsequent attempts to collect thousands in past due interest and fees under threat of foreclosure, including, for example, including, for example, an immediate loss of equity in their home upon the imposition of these charges, adverse impact on debt-related decision making, and the accrual of substantial arrears that could have otherwise been reasonably avoided and the resulting lost availability of foreclosure prevention options.

114.    In addition, some class members suffered actual damages when they paid improper interest and fees to Defendants.

115.    In accordance with Mass. Gen. Laws ch. 93A, § 9, Plaintiff provided a written demand for relief identifying Plaintiff and reasonably describing the unfair acts and practices and injury suffered, on or about September 12, 2024, to Defendants.

116.    Defendants did not respond to this demand.

117.    Defendants' violations of Mass. Gen. Laws ch. 93A, § 2 and their failure to respond in good faith to Plaintiff's demand were knowing and willful.

118.    Plaintiff, for herself and each class member, seeks actual damages; statutory damages; treble damages; reasonable attorneys' fees and costs; equitable relief remedying the illegal practices; and such other relief as the Court deems equitable and just.

<u>**COUNT FIVE:**</u>
**Declaratory Judgment Under 28 U.S.C. § 2201**
**(On Behalf of Plaintiff and the Class)**

119.    Plaintiff incorporates the preceding allegations.

120.    Plaintiff and the putative class were not provided information about the status of their loans contrary to standard mortgage servicing industry practice and in disregard of policies embodied in federal and state laws regulating mortgage servicers.

121.    As a result, Defendants prevented Plaintiff and the putative class members from knowing that they had any obligation on the loans after bankruptcy discharge and making decisions about how to comply with any remaining obligations under the mortgage documents.

122.    Defendants nonetheless are now attempting to collect interest and fees in addition to the unpaid principal balance that they claim accrued after they abandoned communication with Plaintiff and putative class members, under threat of foreclosure.

123.    Plaintiff and members of the class are subject to ongoing harm absent a declaration that interest and fees are uncollectable, waived and/or unenforceable, including the accumulation of additional interest and fees on their mortgages and unfair and unconscionable debt collection practices.

124.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the disputed interest and fees,

125.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the ongoing attempted imposition of the interest and fees.

126.    Accordingly, Plaintiff seeks a declaratory judgment that all interest and fees assessed to discharged HELOCs during any time in which SLS/Shellpoint or its predecessors-in-interest abandoned communications with borrowers are uncollectable, waived and/or unenforceable.

**COUNT SIX:**
**Violation of FDCPA, 15 U.S.C. § 1692f(6)**
**(Individual Claim Against Shellpoint)**

127.    Ms. Hodges incorporates the preceding allegations.

128.    Shellpoint violated 15 U.S.C. § 1692f(6) by threatening to and taking action to foreclose on Ms. Hodges's property, including by sending required pre-foreclosure notices. Shellpoint did not have any present right to possession of the property at the time that it conducted foreclosure activities, because Shellpoint did not send an acceleration notice that complied with the Mortgage.

129.    Instead, the acceleration notice that Shellpoint sent to Ms. Hodges listed an inaccurate outstanding balance and an inflated amount to cure the default.

130.    Because of Shellpoint's violations of 15 U.S.C. § 1692f, Ms. Hodges suffered actual damages, including loss of equity and significant emotional distress.

131.    Based on Shellpoint's violation of § 1692f, Ms. Hodges is entitled to actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1692k.

**WHEREFORE**, Plaintiff, on behalf of herself and the Class Members, seeks the following relief:

a.    Determining that this action may proceed as a class action under Federal Rule of Civil Procedure 23;

b.    Designating Plaintiff as the class representative for the Class;

c.    Designating Plaintiff's Counsel as counsel for the Class;

d.    Issuing proper notice to the Class at Defendants' expense;

e.    Declaring that amounts claimed by Defendants are not owed;

f.    Awarding actual, statutory, and treble damages as provided by the FDCPA and Massachusetts law;

g.    Granting appropriate injunctive relief, including an order prohibiting enforcement of any claim for interest or fees alleged to have accrued during periods of non-communication, including through threat of enforcement of the lien on the property and remedying the illegal practices under Massachusetts law;

h.    Awarding reasonable attorneys' fees and costs and expenses; and

i.    Granting other relief, in law or equity, as this Court may deem appropriate and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,
**EVA HODGES,**
On behalf of herself and all others similarly situated,

By:____/s/ Jennifer S. Wagner_____
Jennifer Wagner (BBO #716264)

26

Shennan Kavanagh (BBO #655174)
National Consumer Law Center
7 Winthrop Square, 4th Floor
Boston, MA 02110
Telephone: (617) 542-8010
skavanagh@nclc.org
jwagner@nclc.org

Matthew W.H. Wessler (BBO #664208)
Gupta Wessler, LLP
361 Newbury Street, Fifth Floor
Boston, MA 02115
Telephone: 617-939-9463
matt@guptawessler.com

Kristi C. Kelly (admitted *pro hac vice*)
Casey Nash (admitted *pro hac vice)*
KELLY GUZZO, PLC
3925 Chain Bridge, Suite 202
Fairfax, VA  22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 3, 2026, a true copy of the above document, filed through the ECF system, will be served electronically through the ECF system on the registered participants as identified on the Notice of Electronic Filing.

<u>/s/ Jennifer S. Wagner</u>
Jennifer Wagner (BBO #716264)